**ALLSTATE FINANCIAL CORPORATION, Plaintiff,**

v.

**PROFESSIONAL HOUSEWARES DISTRIBUTORS, INC., Defendant–Third Party Plaintiff,**

v.

**ALLIED VOICE TECH., INC., et al., Third–Party Defendants.**

No. 1:95–CV–2570.

United States District Court, N.D. Ohio, Eastern Division.

April 6, 1998.

David J. Tocco, William G. Porter, II, Vorys, Sater, Seymour & Pease, Alan S. Kopit, Daniel A. DeMarco, Lee D. Powar, Hahn, Loeser & Parks, Cleveland, OH, for Allstate Financial Corporation.

Michael H. Diamant, Stuart L. Larsen, Kahn, Kleinman, Yanowitz & Arnson, Cleveland, OH, Ronald Paul Friedberg, Law Offices of Anne L. Meyers & Associates, Woodmere Village, OH, for Professional Housewares Distributors, Inc.

Michael N. Ungar, James A. Vollins, Ulmer & Berne, Cleveland, OH, for Allied Voice Tech, Inc., Kool Glo Industries, Inc., Bluechip Computer Ware, Inc.

Allied Voice Tech, Inc., Farmingdale, NY, pro se.

Kool Glo Industries, Inc., Farmingdale, NY, pro se.

Bluechip Computer Ware, Inc., pro se.

Charles F. Clarke, III, Squire, Sanders & Dempsey, Cleveland, OH, pro se.

## MEMORANDUM DECISION

GWIN, District Judge.

On November 21, 1997, Plaintiff Allstate Financial Corporation filed a motion for partial summary judgment in this commercial litigation [Doc. 53]. Plaintiff's motion, if granted, would strike the defendant's twelfth defense. Defendant Professional Housewares Distributors, Inc. says a "price protection clause" in its written purchase orders bar most of the plaintiff's claims. For the reasons outlined below, the Court denies the motion.

### I

Plaintiff Allstate Financial purchased accounts receivable from Third–Party Defendant Allied Voice Tech., Inc. Plaintiff is Allied's factor and assignee. The accounts receivable arose from Allied's sale of electronic voice recording products to the defendant. Professional Housewares Distributors, Inc., defaulted on its obligations to pay Allstate Financial for the products Professional Housewares purchased from Allied.

In a four-count complaint in this diversity action,[1] the plaintiff seeks more than $ 1 million as recovery of the contract prices for fraud, breach of contract, action on account, and negligent misrepresentation. Defendant answered, joined the Allied defendants, then cross-claimed against the three new defendants.[2] The Court granted a default judgment against the three third-party defendants pursuant to Fed.R.Civ.P. 55(b) and in favor of the defendant's cross-claims for breach of contract and fraud.

In defense to plaintiff's claim against the defendant for recovery of the contract prices for these items, Professional Housewares relies on a term in its purchase orders, which it drafted and tendered to Allied. The defendant contends that it was entitled under the contracts to reduce the price of the goods it purchased.

Beginning in approximately June 1995, the defendant placed written purchase orders with Allied for the sales. The reverse side of the purchase orders contained the defendant's offer terms.[3] The third clause appearing in the defendant's printed purchase orders presented to Allied provided as follows:

> As a supplier to Professional Houseware Distributors, Inc. and by accepting this order you confirm that all prices offered to us are the lowest prices at which you sell to any warehousing jobber and or anyone buying from you in similar quantities and that all special offers, allowances, and discounts available are being offered to Professional Houseware Distributors, Inc. Prices are guaranteed against manufacturer's or seller's own decline and legitimate competition. Seller will meet prices of legitimate competition or accept cancellation and return.

Relying on the foregoing clause, Professional Housewares has failed to satisfy certain of the accounts. Specifically, the defendant gives itself credits as follows:

---

**1.** Plaintiff Allstate Financial Corporation is a Virginia corporation and Defendant Professional Housewares Distributors Inc. is an Ohio corporation.

**2.** These third-party defendants are Allied Voice Tech., Inc., Kool Glo Industries, Inc., and Bluechip Computer Ware, Inc. All three were affiliated corporations with common or overlapping ownership. All three had a New York address.

**3.** For purposes of this motion only, Allstate Financial does not dispute that the purchase order terms became part of the contracts between buyer and seller. Allstate Financial reserves its right to offer proof at trial as to which terms became part of the contracts.

Netdowns to Meet Competition—Merchandise Sold $421,735.20
Netdowns to Meet Competition—Quantity on Hand $375,384.50
TOTAL: $797,119.70

Professional Housewares asserts that it is entitled to write off $797,119.70 of its debt to Allstate Financial due to the price protection provision of its purchase orders. The substantial discount represents about 80 percent of the unpaid invoices under contest, according to the plaintiff.

As the Court must view the facts in a pending summary judgment motion in the light most favorable to the nonmoving party, the Court will rely largely on the version of events submitted by Professional Housewares.

In the spring of 1995, Allied marketed a line of three voice recording products to Professional Housewares, a national distributor of small appliances and consumer goods. These products were known as the "Designer Series" and featured the Voice Pro 4000, a pocket-sized, state-of-the-art, voice-activated, one-button recorder which provided up to one minute of recording time for each message. According to Lawrence Gaus, the independent sales agent representing Allied, the Voice Pro 4000 "was going to be the ... the most sophisticated, and that was the most elite product of the group that we had, the most advanced product." Allied promoted the Voice Pro 4000 as a sophisticated message recorder which could compete with the high-end message recorder marketed by Voice-it, a competing manufacturer. The suggested retail price for the Voice Pro 4000 was $69.95, the same as the suggested retail price for the Voice-it.

To complement the Voice Pro 4000, Allied included the Mobile Office Minder ("MOM") in the Designer Series. The MOM was a low-end, hand-held, battery-operated message recorder, marketed as a substitute for an ordinary paper message pad. The MOM was physically larger than the Voice Pro 4000, had fewer features, and had a substantially lower recording time (20 seconds) than the Voice Pro 4000. The MOM initially retailed for $29.95. The Designer Series also included the Time Minder, an alarm clock which replayed user recorded messages.

To solicit the sale of the Designer Series, Allied gave a sales presentation focusing on the Voice Pro 4000 to the defendant's purchasing and sales personnel at the defendant's offices in Wickliffe, Ohio. Professional Housewares was so impressed with the Designer Series, and the Voice Pro 4000 in particular, that it arranged for Allied to present the Designer Series to the defendant's major department store customers such as Dillard's and Carson Praire Scott at the 1995 Gourmet Show in Las Vegas. The defendant says the Designer Series, and in particular the Voice Pro 4000, generated an overwhelming demand for the products among Professional Housewares's customers.

Based on customer response to Allied's presentation and Allied's assurances to the defendant and its customers [4] that the complete Designer Series would be available on specific dates for the 1995 holiday season,[5] Professional Housewares issued purchase orders to Allied for the Designer Series. Despite the repeated oral and written assurances of Allied's President, Steve Lipman, both directly and through Allied's sales representative, Gaus, Allied failed to deliver the Voice Pro 4000 as agreed and delivered the Time Minders and the MOMs late.

Allied's failure to timely deliver the Voice Pro 4000 seriously undermined the marketing campaign for the Designer Series because a number of the defendant's customers withdrew catalog advertisements and greatly reduced their marketing efforts when it became apparent that Allied would not deliver the Voice Pro 4000 in time for the 1995 holiday season. As a result, the MOM and the Time Minder did not receive the market-

---

4. Exhibit E, Excerpts from the Deposition of Elwood "Red" Litzkow ("Litzkow Depo."), at pp. 26—29 (stating that Lipman told him that Dillard's would receive delivery of the Designer Series in September, 1995). Kutil Depo., at p. 18 (stating that Allied told him that Carson would receive the Voice Pro 4000 by Christmas).

5. Lipman stated in his deposition that he was aware that delivery of the Designer Series in time for the fall season was important to Professional Housewares. Lipman Depo., at p. 73, and at p. 76.

ing benefit retailers previously earmarked for the Designer Series. Numerous retailers canceled their orders with the defendant for MOMs. Other retailers demanded and took price reductions from Professional Housewares on the MOMs and Time Minders as the market price "spiraled downward."

## II

Fed.R.Civ.P. 56(c) states the procedure for granting summary judgment and says in pertinent part:

> [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

In considering a motion for summary judgment, the court must view the facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987); *SEC v. Blavin*, 760 F.2d 706, 710 (6th Cir.1985). The moving party has the burden of showing conclusively that no genuine issue of material fact exists. *60 Ivy Street Corp.*, 822 F.2d at 1435. Not every factual dispute between the parties will prevent summary judgment. Rather, the disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The dispute must also be genuine. The facts must be such that if they were proven at trial a reasonable jury could return a verdict for the non-moving party. *Id.* 477 U.S. at 248. The disputed issue does not have to be resolved conclusively in favor of the nonmoving party, but that party is required to present some significant probative evidence which makes it necessary to resolve

the parties' differing versions of the dispute at trial. *60 Ivy Street*, 822 F.2d at 1435 (citing *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569, *reh'g denied*, 393 U.S. 901, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968)). See also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Thus, the judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue a proper jury question, and not to judge the evidence and make findings of fact.[6]

## III

The assignee of a chose in action, such as a receivable, stands in the shoes of his assignor. *James Talcott, Inc. v. H. Corenzwit and Co.*, 76 N.J. 305, 387 A.2d 350, 352 (1978). See also Ohio Revised Code §§ 1302.13(D); 1309.37 (Uniform Commercial Code §§ 2–210(4); 9–318). Therefore, Plaintiff Allstate Financial stands in the shoes of Allied in the dispute with the defendant over payment for the accounts receivable.

Under Ohio law, construction of written contracts is a legal issue for court resolution. *Latina v. Woodpath Development Co.*, 57 Ohio St.3d 212, 214, 567 N.E.2d 262 (1991). Generally, "[t]he intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Kelly v. Medical Life Ins. Co.*, 31 Ohio St.3d 130, 132, 509 N.E.2d 411 (1987). Any ambiguities in that language are resolved against the drafter. *Central Realty Co. v. Clutter*, 62 Ohio St.2d 411, 413, 406 N.E.2d 515 (1980).

The agreement between Allied and Professional Housewares is not a consignment sale in which Allied would have agreed to repurchase or subsidize any products the defendant was unable to sell. Indeed, Professional

---

**6.** "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *60 Ivy Street*, 822 F.2d at 1436 (quoting *Anderson*, 477 U.S. at 249).

Housewares admitted that the purchase orders it presented to Allied do not reflect a "guaranteed sale" in which Allied agreed to permit return of any unsold product. In a letter from the defendant to the plaintiff factor, the defendant said:

> Professional Housewares Distributors, Inc. ("Ph.D.") hereby acknowledges and confirms to Allstate Financial Corporation that none of the purchases by Ph.D., it's divisions or subsidiaries, (collectively, the "Ph.D. Entities") from either Allied Voice Tech and/or Kool Glo Industries, Inc. ("Clients") has been made on a guaranteed sale or consignment sale basis, and that payment to the Clients for goods purchased by any Ph.D. Entity is not contingent on such Ph.D. Entity's receipt of payment on the sale of such goods by such Ph.D. Entity to its customers.

(Letter dated 9/15/95 attached as Exhibit 7).

The defendant says summary judgment is inappropriate at this stage of the litigation and cites portions of four affidavits it has submitted. The affidavits of defendant's President Marc Fallenberg, defendant's Executive Vice President—Sales William Anthony Wallace, as well as excerpts from the depositions of Allied's President Steve Lipman, and the deposition of Lawrence Gaus, establish that: (1) Professional Housewares and Allied negotiated cost markdowns to meet competition and (2) there was a decline in the price of competing products which permitted Professional Housewares to invoke the provisions in the purchase orders. Further, absent Allied's compliance with the "price protection" clause, Professional Housewares had the right to return the goods to Allied for a full credit.[7] Since Allied refused to accept return of the goods, defendant says any subsequent sale merely mitigated its damages in a falling market and was not a waiver of the defendant's revocation of acceptance of Allied's goods.[8]

Since the record shows evidence of falling market prices due to competition for the MOM, which establishes defendant's request for credits against Allied invoices, the defendant has raised a material factual issue precluding summary judgment.

The purchase orders stated that "Prices are guaranteed against manufacturer's or Seller's own decline and legitimate competition. Seller will meet prices of legitimate competition or accept cancellation and return." This language sets forth the parties' agreement that Allied would either reduce the cost of goods to meet "legitimate competition" or accept return of the goods.[9]

Allied marketed the MOM as a low-end voice recording product which retailed at $29.95. Professional Housewares purchased the MOM from Allied at $16.50 per unit and sold the MOM to retailers at $21.00 per unit, yielding the defendant a gross profit margin of 21.4 percent. The MOM was intended to compete based on its substantially lower price. However, in the fall of 1995, retailers with previously more expensive voice recording products such as Voice-it, reduced their price to a price at or below the $29.95 retail price for the MOM. Not surprisingly, the MOM and similar products could no longer be sold at any price even approaching $29.95.

As a result of this competition in the marketplace, Allied and Professional Housewares negotiated markdowns to meet competition in the defendant's cost for the MOM, and Allied granted the defendant markdowns to meet competition for the MOMs in the amount of $180,462.00 on October 6, 1995. This agreed markdown reduced the defendant's cost for the MOMs to $14.50. In turn, Professional Housewares reduced its wholesale price to retailers to $16.50 per unit, thus lowering the defendant's profit margin from 21.4 percent to 12.1 percent. Nonetheless, the price of competing products continued downward.

---

7. The defendant maintains that the majority of the goods for which the plaintiff seeks payment are still in the defendant's warehouses.

8. The record is not clear when, or even if, the defendant revoked acceptance of the goods.

9. According to Lipman, the words "legitimate competition" refer to competition on the retail level. "[C]ompetition normally isn't judged on the wholesale level. It's judged on what it is selling for in the retail marketplace." Lipman Depo. p. 28.

The deposition testimony of both Chris Kutil [10] and Elwood "Red" Litzkow,[11] who were directly involved in purchases of the Designer Series from the defendant, demonstrates the continued decline in prices for voice recording products during 1995. Kutil testified that competitors offered a retail price for the MOM which was less than the wholesale price which Carson paid to Professional Housewares. He observed "[W]e found the Office Minder [MOM] at a lower cost and—lower retail than what we had been paying for it." Also, "[W]e were paying $21.00 for the product and we would have found it out in the marketplace at $19.99." [12] Similarly, Litzkow stated:

The price was getting very competitive. I mean it was getting to be like a price war.... I mean some of those products were being sold for like $9.99 and stuff like that, which is really....—I mean it's really taking a loss, you know.

Professional Housewares has identified the prices of competitive products in the fall and winter of 1995 which exemplify the drastic reduction in prices for competing products. The products listed below competed with the MOM:

1) the Memo Mate Voice Pad retailed for $14.82 on November 25, 1995.

2) the Northwest Bell Digital Recorder retailed for $19.87 on December 10, 1995.

3) the Voice-it Recorder, a recorder with twice the recording time of the MOM, had a reduced retail price of $29.99 on December 17, 1995. This product had retailed at $69.95 in the spring of 1995, and placed the MOM at a huge competitive disadvantage because of a strong advertising campaign and the fact that the Voice-it line of message recorders were far superior to the MOM.

4) the Memo Mate, a voice recorder with a recording time equal to that of the MOM, retailed for $14.88 in December 1995.

Defendant says this decline in the retail prices for voice recording products had a direct impact on the wholesale price for voice recording products which competed with the MOM.

The testimony of Allied's sales representative, Gaus, further illustrates the decline in the market for competitive products. According to Gaus, MOMs were at a competitive disadvantage in the fall of 1995 because "there was a lot of other products out in the market" and "everybody started to drop their prices down." Gaus stated that the MOM was competing with higher-end products which were offered for the same price or less than the MOM. Thereafter, the prices of competitive and higher-end products continued to decline substantially below Professional Housewares's reduced purchase price.

Further exacerbating the reduction in market prices for MOMs, Allied sold MOMs and similar products to retailers at a price below the defendant's wholesale cost in apparent violation of its exclusivity agreement with Professional Housewares.

Moreover, in the fall of 1995 Allied sold to retailers similar products, such as the Auto Minder and the Kitchen Minder. The MOM, the Kitchen Minder and the Auto Minder all had a 20-second recording capacity and the same microchip base. The Auto Minder retailed at $14.97 on December 4, 1995.

Although Professional Housewares sought additional markdowns in view of the continued decline in the competitive market for MOMs, the defendant says Allied refused to discuss further markdowns. Alternatively, Professional Housewares requested that Allied accept return of the MOMs and Time Minders delivered to Professional Housewares as required by the purchase orders,

10. Kutil has been employed by Carson as a buyer for the last fifteen years. Kutil Depo., at p. 5.

11. Litzkow was employed by Dillard's Department Stores as a divisional merchandise manager. He coordinated the store's purchase of the Designer Series. Litzkow Depo., at pp. 6–7.

12. Kutil Depo., p. 19; See Kutil Depo., p. 23 ("the marketplace is where you compete, the stores that are in your market that you compete against"), p. 25 (sale of MOM at purchase price would have resulted in a loss).

but Allied refused to accept any returns. Allied discontinued any contact with the defendant shortly thereafter, and apparently ceased doing business.

Professional Housewares gives evidence that Allied failed to honor its price reduction obligation or accept returns. In response, the defendant says it calculated further markdowns to meet competition based on the prices of other comparable products in the market. Subsequent to the 1995 holiday season, price competition from better, newer products caused the market price for competing products to "plummet" to the point where such competing products can only be sold now as close-out goods.

The defendant has identified portions of the record which demonstrate genuine issues of material fact *See InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), *cert. denied sub nom.,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). The plaintiff has not established that the evidence is such that a reasonable jury could only find in favor of the plaintiff. *See Life Care Centers of America, Inc. v. Charles Town Associates Ltd. Partnership,* 79 F.3d 496, 512 (6th Cir.1996) *(citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Lipman's deposition testimony establishes that Allied negotiated markdowns with the defendant to meet competition. Moreover, the affidavits of Fallenberg and Wallace, as well as the deposition testimony of Lipman, Gaus, Kutil and Litzkow, demonstrate the defendant's entitlement to markdowns on invoice prices for MOMs based on competition. *Cf. James Talcott, Inc. v. H. Corenzwit & Co.,* 387 A.2d 350, 352, 76 N.J. 305 (1978) (held that factor took assignment of receivables subject to "price protection" language in contract between parties). Allied's sale of MOMs directly to other retailers at a cost lower than the wholesale price the defendant paid suggests "legitimate competition" within the terms of the defendant's contract with Allied.

Notwithstanding the contract requirement that Allied either meet competition or accept return of the MOM and the Time Minder, Allied refused to grant further markdowns or accept the defendant's return of goods.

A review of the plaintiff's motion for partial summary judgment in a light that is most favorable to the opposing party discloses that Allstate Financial Corporation has not eliminated all genuine issues of material facts related to the price protection clause in the sales contracts. The defendant's citation to evidence in portions of affidavits in the record is enough to preclude entering summary judgment.

## IV

For the reasons outlined in this opinion, the Court denies the plaintiff's motion for partial summary judgment.

IT IS SO ORDERED.